Good morning everybody. We're here today for oral arguments. We are going to begin with appeal number 23-2366. This is K.C. et al. versus Individual Members of the Medical License Board of Indiana et al. and we are going to begin with argument from the appellant, Mr. Bartow. May it please the court. This case comes down to who decides whether to permit a medical procedure where the science is uncertain and unsettled, state regulators or the courts. Whether we're on rational basis or heightened scrutiny, the Constitution permits regulators to make the call as to how to best balance risk and benefits in rapidly evolving areas of medicine where research is lacking. And so Indiana may decide that transitioning procedures for minors simply pose too much risk and too many unknowns to permit them. This case is fundamentally different from cases about school bathroom policies in two major respects. First, Indiana's law targets a class of medical procedures and prohibits them for all minors. It does not establish different rules for boys or girls or transgender children. The statute mentions sex only for the purpose of identifying procedures that target physical sex characteristics which Dobbs expressly sanctions. And second, Indiana's law does not rest on unsupported cultural suppositions about how children should behave. As the children who take hormones for transitioning run real risk of bone damage, stroke, and infertility. And multiple systematic reviews of the scientific literature have found no evidence to support claims of psychological benefit. And so the deference due legislative judgments regarding conflicting medical evidence on both rational basis and heightened scrutiny provides ample basis for upholding Indiana's law. The district court erred in adjoining it under equal protection and the First Amendment. Starting with the appropriate level of review, the law is subject to rational basis review. It operates differently from school bathroom policies that separate boys and girls into separate categories. It targets a class of medical procedures and prohibits them for all children. This is explicit in the text. Section 13A prohibits the provision of transitioning procedures to minors. All of the exceptions in Section 13C are based on medical condition or the procedure performed. And likewise, Section 5A mentions sex only for the purpose of identifying medical procedures that quote seek to alter sex characteristics. If we were to agree with you Mr. Barta on the idea that mentioning the word sex in a statute is not enough necessarily to invoke an amendment, what are the categories that you're saying the male and female sexes fall into in this particular law? And then if you could, compare it to say Dobbs or the ILO case. Yeah, so your honor, I think that the critical question is what work is sex doing? Is it creating a preference for men over women such as you saw in the VMI case where the policy said VMI would admit men but not women? It's not enough to mention sex. After all, the statute of Dobbs used the word women but that didn't trigger heightened scrutiny. And so I think the critical question here comes down to is there being a preference created for male or female? And that's not the case. I think you can see this through a couple of examples. If you had a boy and a girl walk into an endocrinologist seeking puberty blockers, just knowing whether they're a male or female is not enough information to know whether they can prescribe them. The endocrinologist would have to ask what is the purpose? Is it for addressing central precocious puberty or is it for addressing another condition like gender dysphoria? And I think that shows that the the distinction the statute is making comes down to the diagnosis and the goal of treatment. And that's why both the district court and the red brief can't help but talking about diagnoses and medical goals. Because simply knowing a child's gender or gender identity isn't enough to know whether they can receive the medications under the statute. But to the, you know, I think even if you accept, you know, even if you're it you think that sex is playing a some larger role than just being used to identify a class of procedures, I think Dobbs and Godoldig you know expressly sanction how Indiana is using the term in this statute. And for those two cases particularly, what would be the groups then under Dobbs? Would it be pregnant women and then men and non-pregnant women? Those are the categories? Correct. And I think, you know, Doug, and I but I think that the larger principle Dobbs says is that the regulation of a medical procedure only one sex can undergo doesn't ordinarily trigger heightened scrutiny. And that's exactly what the medical procedures in this case are. The procedures that these transitioning procedures pursue sex-specific outcomes. The goal of a physician treating a patient born female with gender dysphoria is not trying to make that that patient look more like other girls. The physician is pursuing a different goal of making the girl look more like a boy. And similarly, physicians use sex-specific methods in addressing gender dysphoria. Physicians won't prescribe testosterone or estrogen to a girl with gender dysphoria. They will only prescribe testosterone. That is by definition a medical procedure that only one sex can undergo. And so merely mentioning sex for purposes of identifying the procedure doesn't trigger heightened scrutiny here any more than it did in Dobbs or Godoldig where the regulations talked about women and pregnancy because those conditions were specific to a single sex. So is the categorization then for purposes of this statute children with gender dysphoria and that could have both sexes? Is that correct? I think the categorization, Your Honor, is a little more, doesn't use quite those terms, but that's essentially what this statute is doing. It's saying if the procedure is targeting a condition like gender dysphoria by seeking to alter physical sex characteristics, that's on one side. And both boys and girls are in that category. And then the other category, what's left, you know, the children not receiving medications for that purpose, you also have a category that contains both boys and girls as well as, and I think significantly, both transgender and cisgender children. Because not all children who are diagnosed as, or who identify as transgender, have gender dysphoria and not all require treatment with these medications. And so I think this is exactly the situation you have in Gadolding where you had one category that contained both men and women and one category that contained only women. The same is true here. You have one category that contains boys, girls, cisgender, transgender, and then you have another category that contains the same. And so the lines drawn fundamentally come down to the procedure the physicians are trying to perform. And I think the answer the different uses to which medications such as GNRA analogs and testosterone can be put constitute the same procedure. But that simply, I think, overlooks that there's vast differences in prescribing testosterone to a male to rectify delayed puberty from a hormonal disorder which can be verified through blood tests and prescribing it to a female for psychological condition for which there is no blood test. In the two cases the physicians are addressing different conditions. There are different diagnoses, pursuing different objectives, and even giving the drugs in different dosages for different amounts of time. Those are two different procedures. And I think once one recognizes that the procedures are different, it's clear that the law is distinguishing based on procedure and age, not sex or transgender status. And it's not only, and I think, but, you know, to the extent the court thinks heightened scrutiny nevertheless applies, the statute survives. The question on heightened scrutiny is whether the means chosen is substantially related to the state's objective of protecting children. Heightened scrutiny doesn't require the showing of a perfect or least restrictive fit, nor does it require the state to show that the law achieves its objective in every instance. In Indiana's law is substantially related. It's important to note that the district court never found that transitioning procedures for minors are safe or generally effective. It said at page 23 of the short appendix there is, quote, support for defendants view that the safety and efficacy of puberty blockers and hormone therapy is uncertain and unsettled. And I think that suffices on heightened scrutiny. If a state cannot know whether a medical procedure, which is a basis for restricting the procedure, in the goal of protecting children. The only way I think the plaintiffs can win on heightened scrutiny is to show that there is no difference in the safety and efficacy of procedures or of giving minors hormones for the purpose of addressing gender dysphoria and giving it to them for other purposes. But, you know, voices across the medical spectrum, whether we're talking about proponents or institutions conducting independent systematic reviews, acknowledge there are critical differences between the procedures. And the district court again summarizes a lot of this evidence at pages 22 and 23 of the short appendix. It mentions that there's evidence in the record. Puberty blockers carry risk. It says high quality medical research on using these medications to delay past puberty past a typical age is, quote, exceptionally limited. And that the, quote, is from all sides as more research is needed. It also mentions there's evidence cross-sex hormones have risk and that, quote, the long-term effects of using cross-sex hormones for gender transitions are currently unknown. And these statements are backed up by multiple systematic reviews which have looked at the evidence and concluded there is simply, we simply do not know whether these procedures carry long-term benefits. But we do know that there are risk at least for bone density. And likewise, they're backed up by statements from, found in the Endocrine Society and WPAS zone materials. The Endocrine Society rates the evidence for puberty blockers and hormones as either low or very low certainty, which means that there could well be a, low means that there could well be a different effect than what the current research indicates. And very low means that the effect is probably different than what the current research indicates. And I think when a state is tasked with evaluating a relatively new medical procedure and the evidence is conflicting and systematic reviews that have looked at all the literature are coming to the conclusion we don't know what the effects are, it is within the state's power to say we are not going to permit these procedures until we know more about their safety and efficacy. That is consistent with the goal of protecting children. Mr. Barda, there's a lot of medical evidence that we have, a lot of literature that's been brought to us by both the parties in AMICI. There's some discussion with regard to the irreversibility of the cross-sex hormones. Can you point to or is there information in the record before us with regard to reversibility or irreversibility on the puberty blocker? Your Honor, I think there's testimony from both sides on that point. I think as Dr. Ruse and Dr. Cantor point out in their declarations, there is some debate as to whether some of the physical effects are reversible. But one of the effects that's not reversible is the fact is the opportunity cost of losing the time of going through puberty at a normal age. I think that's why the Endocrine Society in its guidelines found at docket 49.1 acknowledged there's a lot of risk and unknowns with puberty blockers. For example, they say at internal pagination 3882, there's adverse effects on bone mineralization and unknown effects on brain development. You see the argument that the puberty blockers is, according to the state, can be properly used for some people and improperly used for others. I understand there is the timing issue, but if there is that proper and improper use and it's going to have a certain effect on a certain group, that's where equal protection may be raised. Your Honor, I think the difference is if we're talking about different effects from giving it at different points in time or different conditions, that just highlights we're talking here about different medical uses. I think it shows that there's no sex discrimination because that puts the state in the option of either banning these medications for all uses or permitting them for all uses. This is not a typical equal protection case where you can write an injunction that says previously you weren't allowing puberty blockers to be used for boys, now you have to start allowing to be used for boys. It's a cross-the-board remedy. I think principally this court does not have to get into the debates about all of the conflicting evidence. It's sufficient, I think, on heightened scrutiny that there is conflicting evidence and that there is substantial evidence to support the conclusion that the effects are, as the district court said, uncertain and unsettled. That is precisely where deference to legislative predictive judgments comes into play, is the courts aren't they? That, of course, is subject to the Constitution. That's why we're here. We don't have an out-and-out rule that there's always deference to legislative judgments, not if there is some over-prevailing concern here, but I just want to understand where you stand on the facts because I quite agree with you that the district court was really clear about the science is uncertain, there's a lot we don't know, but the district court made additional findings you haven't mentioned, you know, that there's harm to certain minors if they are made to stop treatment that they've started. As you sit here now, are you contesting any of the district court's findings or saying that there are any material findings the district court failed to make? Yes, so two responses, Your Honor. First, on the deference point, I think, you know, I don't disagree with you. We're sure about the Constitution, but on heightened scrutiny, the Constitution does require courts to give deference to legislative judgments precisely because legislatures are the best institutions or best institutions best equipped to deal with rapidly evolving areas where the scientific evidence is going to be changing, but on the other finding the district court made, it is true at page 30 the district court said there's evidence, quote, some minors could benefit from these procedures, but I think there's a couple of reasons why that doesn't get over the hump on heightened scrutiny. The first is that heightened scrutiny doesn't require the state to show its chosen means achieves its objective in every instance. It's okay that there's outliers or that maybe a different rule would apply to some minors. Second, there is the logical problem of trying to correct, say, there's a less restrictive means out there because it's impossible to know in advance which minors are going to be the ones benefiting. As the Endocrine Society has said, with current knowledge we cannot predict this psychosocial sexual outcome for any specific child. Implaintive's own witnesses, Mosaic and Grasick, admit that gender identity evolves over time. So just because a minor may identify with one gender now and be receiving some benefit, we don't know whether the benefit will be long-term. Mr. Barter, could we switch focus just a little bit and look at the mediating and abetting aspect of this? I'm unclear as to precisely what the state believes on the outer limits of this aspect of the statute. Does it prevent an Indiana physician from referring an individual patient to a physician in a medical procedure, unlike in Indiana, is in fact legal? So, Your Honor, the aiding and abetting statute in section 15 of the code doesn't draw a distinction between whether the action is in-state or out-of-state, but I think the important thing is the statute is only regulating the in-state conduct of physicians. It's only regulating what physicians do in Indiana. And in specifically targeting any action that aids or abets a transitioning procedure, it's not focused on speech, it's focused on conduct. And so it's a permissible regulation incident to the larger goal of the statute, which is to regulate what physicians are doing. And I think to the end, the final point I'll make on that is, to the extent the court thinks there is some difference between a physician aiding and abetting some in-state action and out-of-state action, the injunction here doesn't draw that distinction. So I think, you know, even if you think there's some difference, it would be over-broad. If the patient were an Indiana resident and the referral was simply for the procedure and the patient was going to return to Indiana, would that make a difference? Well, I don't think it makes a difference because the focus is on where the physician's conduct is occurring. Is it occurring in Indiana? It's covered by the statute. Is the physician's conduct occurring outside the Indiana? That is just not something Indiana regulates. Well, then is that a more direct answer to Judge Ripple's question? He asked you if an Indiana physician, or at least I understood this to be the question, if an Indiana physician is sitting in Indiana, which is a distinction you made, and in his office or her office in Indiana refers a patient for a gender transitioning procedure now out of state because it's banned in Indiana, is that aiding and abetting? I think that would fall within the statute. If there are no further questions, I will reserve the time. It does fall within the statute? Yes, Your Honor. If he simply refers the person, is that how you answer the judge's question? Yes, Your Honor. Okay. Thank you, Mr. Barty. You'll reserve the remainder of your time. Mr. Falk, we'll move to you now on behalf of the appellees. Thank you, and may it please the court. The statute here bans the care that is widely recognized as essential to treat transgender dysphoric youth. Despite the state's attempt to say that there are an even dispute on each side, this treatment is endorsed by every major medical organization in the United States. It's supported by ample evidence, and it necessitates, the state statute here, necessitates discrimination on the grounds of sex. Whitaker and AC held that discrimination against transgender youth is sex discrimination because the lines drawn are necessarily based on sex. This is echoed, of course, in Boston. You're a doctor. You're sitting in your office. You know that you have a 16-year-old coming to see you for testosterone. If that youth is a cisgender male, you're fine. If that youth is a transgender male, you are fine. Mr. Falk, let's vary the hypothetical. Sure. Doctor is blind to the sex. Doctor would ask, are you uncomfortable in your body? Do you feel out of harmony with the sex assigned at birth? At that instance, the doctor is not asking about the sex, and then the doctor would have to make a determination as to whether or not there's gender dysphoria that would require medical treatment, correct? Correct, but however we phrase the hypothetical, it's going to boil down to the fact that sex discrimination is based into the definition of gender transition procedures, because at some point, we're going to have to recognize that if you are a cisgender male, one sort of treatment. If you are a transgender male, you can't get that treatment. The line is drawn right down the sex-based distinction. Isn't the way the inquiry is posed important? I'm thinking, for example, the DSM-5, with regard to gender dysphoria, doesn't make mention of sex. It makes mention of gender, so that medical professional, whether it's a psychiatrist or an endocrinologist, is considering the condition of the patient before them, first and foremost, not the sex of the person. When the person says, I'm uncomfortable in my body, I have all this anxiety, depression, suicidality, the doctor is going to have to say, I hate to ask you this, but what are your sex organs? Because before I can go any further to decide whether or not this law allows me to prescribe what everyone recommends should be prescribed for this child, I have to figure out what your sex at birth was, and that's the definition of sex. Isn't there a distinction between, though, a determination that something must be prescribed versus what must be prescribed? The physician would initially confront the inquiry that we talked about, discomfort in the body or discomfort with sex assigned at birth. In that circumstance, the initial determination being made by the physician, at least according to DSM-5 with regard to gender dysphoria, would be that call as to whether or not there should be treatment. Once the determination is that treatment should be made, further questions might follow, such as what that treatment is. Don't physicians go through that type of two-step analysis in all diagnoses and prescriptions? I assume so, but again, at some point, the question of sex has to be raised. I'm looking at your blood test here. Your testosterone is really low. You're telling me, boy, your testosterone is really low. I know what I can do, because for decades, doctors have been prescribing testosterone to male adolescents who have low T levels. I hate to ask you this, but what was the sex you were born at? What sex organs did you have at birth? Because until I answer that question, I can't go forward, and any way we wrap it, that this is a sex-based determination. It's no different than Whitaker. It's no different in AC. The line is being drawn based on sex. The state says, well, everyone's being treated the same. Well, of course, in Whitaker, the school system said that we're treating all transgender persons the same. And this court said, well, no, I mean, you're discriminating against all of them. You don't get points for that. Equal protection looks at how the individual is being treated, and here we have a line drawn that clearly discriminates against sex. It requires heightened scrutiny. And it does not meet the evidence before the district court, and now before you, does not meet the exacting scrutiny that is required. Mr. Falk, on that same line of questioning I posed to Mr. Barta, on the groupings that result, aren't the groupings here involving both sexes? The groupings would include gender dysphoria, male or female. Those are the individuals who could be so categorized. And then I'm trying to map onto that Dobbs and Aiello and these other cases where the categorizations also didn't break down into two sexes. Well, Gadaldic tells us that it's okay to have an objectively identifiable physical condition that is not a proxy for sex. And Dobbs interprets Gadaldic by saying that a regulation of a medical procedure that only one sex can undergo doesn't necessarily trigger heightened scrutiny absent pretext. Again, I'm back in my doctor's office. I'm looking at a patient. The patient needs testosterone. Both cisgender males and transgender males need testosterone. That's not a medical procedure that only one sex can undergo. And to say that this statute is not a proxy for sex, it is. It's all about sex. You cannot figure out what is a gender transition procedure without noting sex. It's something that alters typical sex, Section 5 says, or it's something that instills a different sex, Section 5 says. This is a sex-based classification. As I said, the evidence is undisputed that it is the treatment of choice endorsed by every major medical organization. Equally important, the evidence is clear and the state has offered no other evidence-based alternative to this treatment. At page 35 of the transcript for the Plummer injunction, the attorney for the state admits there are no studies showing that psychotherapy alone can remedy gender dysphoria. And the district court did find that plaintiffs have benefited greatly from the treatment. The evidence is undisputed as to how well these young persons have done. One parent, I believe, said in a deposition that it's like getting my child back. One of the things that struck the district court was that, you know, these European countries have gone a little bit further down the line than we have in the states and extensively studied. They're seeing the risks, they're seeing that still more study is needed, and none of them have responded with an out-and-out ban on these medical procedures for gender dysphoria. The state comes back and says, well, it doesn't matter what European countries are doing. We still have the right to ban it for our Indiana children. What response? Based on what, Your Honor? Based on what? What is your response to this? No, no, I'm sorry. I'm sorry. My response to the state is, what is that based on? Okay. The state gave us five experts who in total had seen 20, I believe, 22 children with gender dysphoria. They had not done independent research. They had not done studies. We have three experts who've seen thousands of young persons who've done cross-sectional studies, have done in-depth studies, have peer-reviewed articles on these subjects. You can't just say, go on the internet and find literature that goes contrary to you and say somehow that gives you a substantial government interest. The district court found that plaintiffs have benefited. The district court found that there's evidence that without the ban treatment, the children will suffer irreparable harm, which makes sense because the DSM-5 tells us that the gender dysphoria diagnosis depends on clinically significant distress. So the court finds that without this, there's evidence that the children will suffer depression, suicidality, PTSD. But then, Mr. Falk, I get back to that DSM-5 criteria for gender dysphoria. It's not sex-based. It's gender-based. The questions that are being inquired, a strong desire to be of the other gender, a strong desire to be treated as the other gender, a strong conviction one has typical feelings, reaction of the gender, it's not grounded in anything about maleness or femaleness. It's grounded in that distinction between gender and sex. That's correct. However, the treatment for that, the treatment that's recognized, as I said, by every major medical organization is to address that problem by addressing the sex, by providing cross-sex hormones, by providing puberty blockers. And so the state has drawn a line between transgender persons and non-transgender youth in the same way that the school systems in Whitaker and AC drew a line between transgender children and non-transgender children. And the state is saying you just can't be your typical sex, is what the statute says, or instill different sex characteristics. Tough. You can't do it. And the state has no alternative treatment, right? The one alternative treatment is psychotherapy, but the state admits there are no studies on that. The other is watchful waiting, which watch your child suffer with a terrible problem that can cause suicidality. That is not an option that any parent is ever going to elect. Mr. Falk, if I may change again the focus, I would like your view on the aiding and abetting aspect of the statute and its scope. I asked your brother what the extent of the prohibition was, and we're going to have to get back to that, I think, on his rebuttal. But what do you think it is? Do they give you the same hypothetical? What about the Indiana physician with an Indiana patient who refers a person to a state where this is entirely legal? Has that person, has that physician violated the statute? Yes, yes. I think we, that was exactly the point we made in the district court, and the state never denied that. And I think Mr. Barter agreed that that physician, even though that physician is engaging in pure speech, would be deemed to violate the statute. And as we noted to this court and district court, you can't read the Bigelow case where the Supreme Court said it's not even rational to prohibit out-of-state information about a lawful procedure in that second state. You cannot rationally prohibit in the first state. You can't read that case without recognizing here we're dealing with a content-based restriction on speech that is clearly unconstitutional. But there are, assuming we were to agree with the state on the merits, the substantive merits of the statute, the equal protection argument, shall we say, there would be applications of the aiding and abetting provision that would be clearly constitutional. That is correct, Your Honor, and the district court enjoined the aiding and abetting, I think, only as to the examples you first gave when it's involving pure speech. If the statute is otherwise constitutional and a doctor decides to get someone in their car and drive them to Illinois, I think that would be deemed to be aiding and abetting under the statute, and that is certainly not protected speech. The problem here is that you have doctors who would want to make referrals, who want to cooperate with out-of-state practitioners to serve their clients, who are going to be engaging in pure speech on the phone. Here's my patient. Here's the information. That is all prohibited. How about faxing the records? Again, I think that is as close to conduct, Your Honor, then we still have to meet the O'Brien standard, which is elevated scrutiny, and Bigelow tells us it isn't even minimally rational for Indiana to try and prohibit something which is legal in another state. Indiana cites the Hansen case, but the Hansen case dealt with the court's interpretation of something encouraging and inducing criminal activity. A doctor telling their patient, hey, Dr. Smith can take care of you in Illinois, that's not criminal, and that's that's protected by the First Amendment, and the district court should therefore be affirmed. Thank you very much. Thank you very much, Mr. Falk. We are now going to move Mr. Brennan. Good morning. May it please the court, Jonathan Backer for the United States' Amicus. Judge Brennan, I want to pick up on your questioning about going into the doctor's office and if the doctor phrased the question in terms of, am I out of harmony with my body? That question is basically functionally the equivalent of saying, are you transgender? And that's why this case goes to the heart of Whitaker and AC. If you look at Section 5 of the statute, which defines the prohibited gender transition procedure, that is a transgender gerrymander. It sets forth the prohibited procedures and then goes forth to carve out a whole list of applications of puberty blockers, testosterone, estrogen, that only a non-transgender individual could take them for. And so because we're dealing with drugs that anyone, whether their sex assigned at birth is male or female, can take, and the trigger as to whether or not it falls within the prohibitions in SCA 480 is whether or not you're taking it because of being transgender, that's why Whitaker and AC's reasoning apply here. I also, Judge Brennan, want to address your question about regulating both sexes. As my friend mentioned, the Equal Protection Clause protects at the individual level, not the group level. And this argument that, well, if it affects both sexes, then there's no discrimination, that's the very thing that Justice Scalia advanced in dissent in JEB. That was about bats and challenges on the basis of gender or sex. And Justice Scalia pointed out, well, for every male juristruct, there is also a female juristruct, so there is no discrimination at the group level. But that's not what the Equal Protection requires. It requires an analysis on the individual level. So I think the analysis that was going to Dobbs and Aiello and the distinction between the certain group versus another group, neither individual group being based on a single sex. Right. So Dobbs and Aiello, to hear the state's argument, those cases set forth a completely different equal protection analysis in the medical context. And that's just wrong. What those cases are about is if something is a pretext, whether something is a proxy for sex discrimination. And here, again, because this is a case that draws the line based on transgender status. And in addition, I point out that there are 29 references to sex in the course of SEA 480. So if the purpose wasn't to draw a fault line based on sex, why so many mentions of sex? And why frame, as I said, a transgender gerrymander in Section 5 of the statutes? This is categorically different than what we had in Gedaldig or Dobbs, where it was a procedure that only a person of one sex assigned at birth could undergo. But the individuals who'd be presenting at the doctor's office with the possibility of gender dysphoria are not specifically male or specifically female. So the categorization of the individuals coming in is not, even if there's many different sex, that doesn't necessarily trigger the fact that the statute itself discriminates. Well, I think at bottom, my friend was right that the bottom line inquiry is going to be if you want testosterone, you have to be somebody who's male assigned at birth as male. So I think that's true. But in addition, you have the transgender status discrimination, which under this court's precedent in Whittaker and AC, that is inherently sex discrimination. And I also think framing this in terms of whether there's discrimination on the medical procedure level, that bakes into the equal protection analysis, the very classification that's being challenged. And that just can't be right, because as my friend pointed out, you confronted that issue in AC and Whittaker in the school bathroom context. And the defendant there said, well, you have men and women on both sides. But the court said no, because that still draws a line based on gender nonconformity. And you could also apply that same sort of reasoning in the racial discrimination context, if you're talking about an interracial marriage ban. Well, that could be framed as a neutral regulation of cross-race marriages. But of course, the Supreme Court rejected that reasoning in Loving. So the core principle here is that there's transgender status discrimination, there is sex discrimination, and therefore, heightened scrutiny applies. We would ask this court to affirm the district court's conclusion that plaintiffs are likely to succeed on the merits of their equal protection claim. Thank you, Mr. Bakker. Mr. Barta, we'll go back to you now for rebuttal. A few quick points, Your Honor. First, on this idea that there is some sort of transgender gerrymander, that would place there is no transgender distinction in the face of the statute. So this would put us in a disparate impact land. But the plaintiffs have not brought in a disparate impact challenge and have not shown the statute was enacted because of, rather in spite of, effects. As the district court acknowledged, there are important good reasons for the statute that relate to concerns about risk and benefits. Second, on this idea of group versus benefit, as well as what is the goal of these procedures, it is simply recognizing that the underlying procedures being regulated are sex-specific. And when the doctors are the ones making the sex distinction, it is perfectly permissible for regulations of those procedures to make the same distinction. And I think the third point on the First Amendment, certainly the statute would cover some referrals out of state, but it also covers referrals within the state where the procedures are legal. And so the injunction would be over-broad. I want to give Judge Ripple a chance if he wants to follow up on that. No. Excellent. Thank you, Mr. Barta. Thank you, Mr. Falk. Thank you, Mr. Backer. The case will be taken under advisement. The court will next call...